2020 IL App (1st) 180994

No. 1-18-0994

Opinion filed June 11, 2020

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| CENTRAL NURSING REALTY, LLC, | ) | Petition for Review of a Final |
| | ) | Administrative Decision of the |
| Petitioner, | ) | Illinois Property Tax Appeal Board |
| | ) | |
| v. | ) | |
| | ) | |
| THE ILLINOIS PROPERTY TAX APPEAL | ) | |
| BOARD; THE COOK COUNTY BOARD OF | ) | |
| REVIEW; and THE CHICAGO BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | Nos. 11-31329.001-C-3 through 11- |
| Respondents. | ) | 31329.010-C-3 |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Presiding Justice Gordon specially concurred.

**OPINION**

¶ 1    Central Nursing Realty, LLC (Central Nursing), challenges a decision of the Illinois

Property Tax Appeal Board (Board) assessing the value of its real property. Central Nursing argues

that the Board overstated the fair market value of the property and failed to consider its argument

and supporting evidence that the property was inequitably assessed in comparison to similar properties. For the following reasons, we affirm the Board's decision.[1]

¶ 2                                    I. BACKGROUND

¶ 3     The subject property is a 245-bed, skilled-care nursing home located at 2450 North Central Avenue in Chicago, Illinois, in the Jefferson Township section of Cook County. It consists of 32,334 square feet of land, improved with a four-story, 65,088 square foot building with 52,157 square feet above grade. The building was constructed in 1973 of masonry and steel. Additional site improvements include a 45-car paved parking lot. Central Nursing purchased the nursing home business as a going concern, including its real property and tangible and intangible personal property, for $25 million in 2009. At the time, the buyer and seller attributed approximately $7.5 million of the total purchase price to the value of the real estate.

¶ 4     In 2011, the Cook County Assessor assessed the land at a value of $127,312 and the improvements at a value of $1,930,042, for a total assessed value of $2,057,354. Because commercial property in Cook County is assessed at 25% of its fair market value, the assessment implied that the subject property had a fair market value of $8,229,416. Central Nursing appealed to the Cook County Board of Review, which rejected its request to reduce the assessment.

¶ 5     Central Nursing then appealed to the Board, arguing that the assessment was excessive and inequitable and that it should be reduced to one of several alternative amounts. First, Central Nursing argued that the assessment should be reduced to $1,872,875. In support, Central Nursing submitted the real estate transfer declaration form filed after its 2009 purchase of the going concern, in which the parties attested that the fair market value of the real estate was $7,491,500.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 6       Next, under what it called the "Economic Approach to Value," Central Nursing argued that the assessment should be reduced to $1,816,666 to reflect a fair market value of $7,266,664. In support of this argument, Central Nursing attached a 2010 financial statement showing revenue of $10,222,798. Although the statement showed net income of $1,236,368, Central Nursing instead (without explanation) "[s]tabiliz[ed]" its expenses at 90% of revenue, producing a 2010 net income of $1,022,280, which it then "capitaliz[ed]" at a rate of 14.07%, yielding (according to its calculation) a fair market value of $7,266,664.[2]

¶ 7       As a further alternative, Central Nursing argued that the assessment should be reduced to $1,087,496, based on a fair market value of $4,349,987, which it calculated using the capital component of the Medicaid reimbursement rate that it deemed attributable to the real estate. As support for this method of valuation, Central Nursing cited (but did not attach) an unpublished, out-of-state trial court decision.

¶ 8       As its next alternative, Central Nursing argued that the assessment should be reduced to $1.35 million based on an appraised fair market value of $5.4 million. In support, Central Nursing submitted an appraisal report by certified real estate appraiser Ryan Korth, which analyzed the property using three approaches to valuation—the cost approach, the income capitalization approach, and the sales comparison approach. Under the cost approach, Korth estimated the value of the land by considering sales of four comparable parcels in surrounding neighborhoods between 2008 and 2011. After calculating the sales prices of those lots per square foot of floor area ratio (which measures the maximum allowable ratio of building area to lot size) and making relevant adjustments, Korth concluded that the subject property's land had a fair market value of $1 million.

---

[2]As the Board later noted, a correct calculation using Central Nursing's figures yields a fair market value of $7,265,672.

¶ 9       Korth then used the Marshall Valuation Service (MVS) cost manual to estimate the cost of reproducing the building. Based on the type and quality of its construction, Korth classified the building as a Class C—Average Convalescent Hospital with a replacement cost of $11,484,825. Korth explained that he did not factor entrepreneurial incentive (the profit that a developer can expect to earn on a project) into the building's replacement cost because nursing homes are not typically built by developers on speculation. Korth then calculated the building's depreciated value using the age/life method. Based on its condition and maintenance history, Korth estimated that the building had an effective age of 25 years. In addition, relying on the MVS cost manual's estimate for Class C—Average Convalescent Hospitals, Korth determined that the building had a total economic life of 40 years. By dividing the building's effective age by its total economic life, Korth calculated that the building had depreciated by 62.5% and had a current fair market value of $4,300,184. Finally, Korth estimated that the property's site improvements had a depreciated value of $40,000. In total, under the cost approach, Korth concluded that the property's fair market value was $5.3 million, rounded.

¶ 10      Under the income capitalization approach, Korth determined that the total value of the business as a going concern was $25.2 million. He arrived at this figure by dividing the business's adjusted net operating income by a loaded capitalization rate. He then subtracted the value of the real estate (as previously determined under the cost approach) from the going concern value, yielding a non-real-estate business value of $19.9 million. In a process that the Board described as "somewhat circular," Korth then subtracted the business's non-real-estate value from its going concern value, which (unsurprisingly) yielded a real estate value of $5.3 million.

¶ 11      Under the sales comparison approach, Korth considered recent sales of four comparable nursing home businesses. After subtracting the businesses' non-real-estate values and making

relevant adjustments, Korth concluded that the subject property had a fair market value of $4.7 million.

¶ 12    In reconciling the results of the three approaches, Korth placed the most weight on the cost approach, explaining that it provided the best indication of the value of the real property because it did not require the extraction of the business's non-real-estate value from its overall value as a going concern. Although Korth's initial report concluded that the property had a fair market value of $5.3 million as of January 1, 2012, he subsequently stated that the value of the property as of the relevant date of January 1, 2011, was $5.4 million. In addition, Korth explained that he did not consider the value that Central Nursing attributed to the property on the real estate transfer declaration form that it filed after purchasing the going concern because the form was not completed by a professional appraiser.

¶ 13    Central Nursing's final alternative argument sought to reduce the assessed value of the property to $1,478,812, based on assessments of allegedly comparable properties. In support of this equity argument, Central Nursing submitted a grid with details such as age, address, lot size, building area, construction class and condition, number of beds, and assessment value for the subject property and eight allegedly comparable nursing homes. According to the data provided, the comparable properties' improvements were assessed at values ranging from $5076 per bed to $7700 per bed, whereas the subject property's improvement assessment was $7878 per bed. As the Board later noted, while Central Nursing's initial grid indicated that the property with an improvement assessment of $5076 per bed had 176 beds, two additional grids that Central Nursing submitted listed the property as having only 146 beds, which produced an improvement assessment of $6119 per bed for that property. The additional grids also identified three other allegedly comparable properties but provided assessment information for only one of them, indicating an

improvement assessment of $6001 per bed. In addition, Central Nursing submitted numerous computer-generated printouts from the Cook County Assessor's office that listed the assessment values for the subject property and the eight allegedly comparable properties included in its initial grid.

¶ 14    In response to the appeal, the Cook County Board of Review submitted data for five allegedly comparable properties that sold between September 2006 and December 2009 for prices ranging from $193 per square foot of building area to $307 per square foot of building area. By comparison, the Board of Review's assessment of the subject property implied a fair market value of $8,229,416, which equated to a value of $126 per square foot of total building area or $158 per square foot of building area excluding basement space.

¶ 15    The Board of Education of the City of Chicago intervened to defend the assessment and submitted an appraisal by Eric Dost. Like Korth, Dost analyzed the property using the cost approach, the income capitalization approach, and the sales comparison approach. To estimate the value of the land under the cost approach, Dost considered five comparable parcels that sold between December 2009 and November 2010. After calculating their sale prices per square foot and making relevant adjustments, Dost concluded that the subject land had a fair market value of $650,000. Based on the building's HVAC system and exterior detail, Dost concluded that the structure was a Class C—Good (rather than Average) Convalescent Hospital. Using the MVS cost manual for a structure of that type and quality, Dost calculated a replacement cost of $14,776,623, which included a 15% markup to account for entrepreneurial incentive. Using the age/life method to determine the building's depreciated value, Dost estimated that the building had an effective age of 20 years, based on its maintenance history, lack of functional obsolescence, and capital improvements of $190,000 between 2009 and 2010. In addition, although the MVS guidelines

provided that a Class C—Good Convalescent Hospital had a total economic life of 45 years, Dost concluded that the building's total economic life was 50 years, based on his experience and inspection of the property. Accordingly, Dost calculated that the building had depreciated by 40% and had a current fair market value of $8,865,974. Dost then estimated that the property's site improvements had a current value of $42,000, which yielded a total fair market value of $9.6 million, rounded.

¶ 16    Under the income capitalization approach, Dost determined that the market value of the business as a going concern was $15.5 million, rounded, which he calculated by dividing the business's adjusted net operating income by a loaded capitalization rate. He then used two separate methodologies to extract the business's real estate value. First, using the quantification of business value methodology, Dost calculated the portion of the business's net operating income attributable to its proprietary earnings and divided that amount by a capitalization rate that yielded a non-real-estate business value of $1.7 million, rounded. Second, using the cost approach comparison methodology, Dost subtracted the value of the business's real estate (as previously determined using the cost approach), as well as the value of the business's personal property, from the going concern value, which resulted in a business value $5,287,500. After averaging those figures, Dost calculated a business value of $3.5 million, rounded, which he subtracted (along with the value of the business's personal property) from the going concern value, yielding a real estate value of $11.4 million, rounded.

¶ 17    Finally, under the sales comparison approach, Dost considered recent sales of five comparable nursing home businesses and concluded, after making relevant adjustments, that the subject business had a going concern value of $14.7 million. Dost then subtracted the business and personal property values calculated under the income capitalization approach from the going

concern value to arrive at a real estate value of $10.6 million, rounded. In reconciling the results of the various approaches, Dost placed primary emphasis on the cost and income capitalization approaches and concluded that the subject property had a fair market value of $10.5 million.

¶ 18    In rebuttal, Central Nursing submitted a report by appraiser Bradley Braemer that identified several alleged errors in the Dost appraisal but did not provide an independent view of the property's fair market value. Braemer opined that Dost's decision to factor entrepreneurial incentive into the replacement cost of the building was inappropriate and unsupported by local market data. He also questioned Dost's conclusion that the building had an effective age of 20 years, opining that the capital improvements cited by Dost were relatively minimal. Moreover, although Braemer agreed with Dost's classification of the building as a Class C—Good Convalescent Hospital, he criticized Dost's decision to deviate from the MVS guidelines when estimating the building's total economic life.

¶ 19    In addition, Central Nursing's rebuttal included a revised version of its initial grid of comparable nursing homes that added assessment information and property details for the comparable properties identified by the Board of Review. According to the revised grid, the improvement assessments for the Board of Review's comparable properties ranged from $4751 per bed to $11,058 per bed.

¶ 20    The matter proceeded to an evidentiary hearing, at which Korth, Dost, and Braemer testified consistently with their reports. On the morning of the hearing, Central Nursing requested leave to submit updated assessment information for several of the comparable properties that it and the Board of Review had previously identified. According to Central Nursing, the assessments for those properties had been revised as a result of tax objection proceedings brought by the

property owners in the circuit court under section 23-15 of the Property Tax Code (35 ILCS 200/23-15 (West 2018)). The administrative law judge (ALJ) allowed Central Nursing to submit the updated assessment information but ruled that the circuit court judgments themselves were inadmissible. Based on the updated grid submitted by Central Nursing, its eight comparable properties had improvement assessments ranging from $3795 per bed to $7700 per bed and the Board of Review's comparable properties had improvement assessments ranging from $4401 per bed to $8887 per bed.[3]

¶ 21    The ALJ allowed the Board of Review and the Board of Education 14 days to file responses to the updated assessment information and gave Central Nursing seven days to file a reply. In a joint response, the Board of Review and the Board of Education argued, among other things, that Central Nursing's updated grid relied on inaccurate assessment information for the comparable properties. Although the Board's decision states that Central Nursing did not file a reply, and no reply appears in the record on appeal, Central Nursing has included a copy of the reply in the appendix to its brief, along with a printout of an email from the ALJ acknowledging its receipt. In the reply, Central Nursing explained that the assessment information in the updated grid correctly reflected the revised assessments entered as a result of the property owners' circuit court challenges.

¶ 22    In a written decision, the Board concluded that a reduction in the assessed value of the subject property from $2,057,354 to $1,957,509 was warranted but rejected Central Nursing's

_____

[3]As the Board noted, the correct range of updated assessments for Central Nursing's comparable properties appears to be $4191 per bed to $7700 per bed. The property that Central Nursing identified as having an updated assessed value of $3795 per bed is the property that it previously described as having either 176 bed or 146 beds. The assessment value of $3795 per bed appears to be based on the assumption that the property has 176 beds. If the property in fact has 146 beds, its per-bed assessed value would be $4575.

request for a further reduction. At the outset, the Board identified Central Nursing's five alternative arguments in support of an assessment reduction, including its argument that the subject property was "inequitably assessed." With respect to the equity argument, the Board noted that Central Nursing had submitted "varying degrees of information" for its allegedly comparable properties and described Central Nursing's evidentiary submission as "nothing less than convoluted" and containing "numerous discrepancies." Nevertheless, the Board stated that it did "its best to ascertain the correct information for each comparable [property] based on the data submitted by [Central Nursing]." In particular, after "considering the updated assessment information" that Central Nursing submitted during the hearing, the Board found that the properties identified by Central Nursing "had improvement assessments that ranged from *** $4,191.14 to $7,700.04 per bed," while the properties identified by the Board of Review "had improvement assessments that ranged from *** $4,400.89 to $8,886.91 per bed."

¶ 23    Addressing Central Nursing's arguments in turn, the Board first rejected its request to assess the property using the "Economic Approach to Value." The Board noted that Central Nursing offered no evidence that the historical income it relied on under that approach was "reflective of the market and the property's capacity for earning income," even though "it is the capacity for earning income, rather than the income actually derived, which reflects 'fair cash value' for taxation purposes." See *Springfield Marine Bank v. Property Tax Appeal Board*, 44 Ill. 2d 428, 431 (1970). The Board was similarly unpersuaded by Central Nursing's argument that the property's fair market value should be calculated using Medicaid reimbursement rates, noting that Central Nursing's own expert, Korth, found the method unreliable because Illinois had not rebased its Medicaid reimbursement rate in more than 20 years.

¶ 24    The Board likewise rejected Central Nursing's contention that the fair market value of the property could be established by the real estate transfer declaration form that it filed after its 2009 purchase of the going concern, in which both it and the seller attested that the real property involved in the sale had a fair market value of approximately $7.5 million. Because Central Nursing offered no evidence concerning the process by which the parties arrived at that figure, the Board accorded it no weight.

¶ 25    The Board then considered the dueling appraisals by Korth and Dost, as well as Braemer's review of Dost's appraisal. The Board noted that both Korth and Dost placed emphasis on the cost approach when valuing the real estate and that Braemer agreed that it was appropriate to use that approach when valuing a nursing home's real estate. The Board acknowledged that the appraisers also analyzed the subject property using the income capitalization and sales comparison approaches, but it gave the results reached under those approaches "diminished weight" because they were "substantially reliant on the value of the subject's real estate as determined under the appraisers' respective cost approaches."

¶ 26    Although the Board found that the Korth and Dost appraisals "lack[ed] sufficient evidence to support their respective conclusions under the cost approach," the Board determined that it could "us[e] the credible and reliable evidence provided in [the] appraisals" to "craft an appropriate conclusion of value." To that end, the Board first determined that Dost's valuation of the land at $650,000 was more reliable than Korth's higher estimate. In particular, the Board explained that it accorded diminished weight to Korth's valuation because it relied on comparable sales that were more remote in time than those that Dost considered and because it compared the various properties using sales price per square foot of floor area ratio rather than actual square footage.

¶ 27    As for the value of the building, the Board noted that Korth and Dost agreed that the building was a Class C Convalescent Hospital under the MVS guidelines but disagreed about the quality of the building's construction, with Korth concluding that it was average and Dost concluding that it was good. The Board credited Dost's conclusion on this point, noting that Braemer did not find it to be erroneous. In addition, the Board noted that the building had been adequately maintained and (in both appraisers' views) had an effective age that was lower than its actual age, suggesting that it was in good condition. The Board disagreed, however, with Dost's decision to factor entrepreneurial incentive into the replacement cost of the building, due to a lack of market data supporting the inclusion of entrepreneurial incentive in the value of a nursing home. Based on the MVS cost manual data for a Class C—Good Convalescent Hospital, but excluding Dost's inclusion of entrepreneurial incentive, the Board determined that the building's replacement cost was $12,849,237.

¶ 28    To calculate the building's current value, the Board found that the age/life method used by Korth and Dost, and approved by Braemer, was "the proper way to determine the subject's depreciation." The Board noted that Korth and Dost agreed that the building's effective age was lower than its actual age of 38 years, with Korth estimating 25 years and Dost 20 years. The Board noted that Braemer criticized Dost's estimate, but it found Dost's view more reliable than Korth's, noting the "significant capital improvements" made to the building between 2009 and 2010. With respect to the building's total economic life, the Board disagreed with both appraisers. The Board rejected Korth's estimate of 40 years because it relied on the MVS guidelines for a Class C— Average Convalescent Hospital rather than a Class C—Good Convalescent Hospital. The Board likewise rejected Dost's estimate of 50 years, concluding that Dost provided no support for his

decision to deviate from the MVS guidelines for a Class C—Good Convalescent Hospital. Adhering to the MVS guidelines, the Board concluded that the building had a total economic life of 45 years. Thus, with a replacement cost of $12,849,237 and a depreciation rate of 44.44%, the Board concluded that the building had a current fair market value of $7,139,036. Additionally, the Board determined that the fair market value of the site improvements was $41,000, which was halfway between the estimates provided by Korth and Dost.

¶ 29    In total, the Board concluded that the fair market value of the subject property was $7,830,036, which resulted in an assessed value of $1,957,509 under the 25% assessment level applicable to commercial properties in Cook County. Having determined the property's fair market value, the Board also concluded that the property was "fairly and equitably assessed" and that "no reduction [was] warranted based on [Central Nursing's] equity argument."

¶ 30    Central Nursing timely petitioned for our review of the Board's decision.

¶ 31                                    II. ANALYSIS

¶ 32    Final decisions of the Board are subject to review under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)). 35 ILCS 200/16-195 (West 2018). In cases where, as here, a change in assessed value of $300,000 or more was sought before the Board, review lies directly in the appellate court. *Id.* The scope of our review "extend[s] to all questions of law and fact." 735 ILCS 5/3-110 (West 2018). We review the Board's conclusions of law *de novo* and its resolution of mixed questions of law and fact for clear error. *Cook County Board of Review v. Property Tax Appeal Board*, 403 Ill. App. 3d 139, 143 (2010). The Board's "findings and conclusions on questions of fact," however, are deemed "*prima facie* true and correct" (735 ILCS 5/3-110 (West 2018)) and will be reversed only if they are against the manifest weight of the

evidence, meaning that an opposite conclusion is clearly evident from the record. *Cook County Board of Review*, 403 Ill. App. 3d at 143.

¶ 33    Central Nursing's first contention is that the Board violated the Illinois Constitution, the Property Tax Code, and the Board's rules by disregarding its argument that the subject property was inequitably assessed in comparison to similar properties. The Illinois Constitution provides that "taxes upon real property shall be levied uniformly by valuation ascertained as the General Assembly shall provide by law." Ill. Const. 1970, art. IX, § 4(a). Under this provision, "taxing officials may not value the same kinds of properties within the same taxing boundary at different proportions of their true value." *John J. Moroney & Co. v. Illinois Property Tax Appeal Board*, 2013 IL App (1st) 120493, ¶ 39. "The party objecting to an assessment on lack of uniformity grounds bears the burden of proving the disparity by clear and convincing evidence." *Walsh v. Property Tax Appeal Board*, 181 Ill. 2d 228, 234 (1998); see also 86 Ill. Adm. Code 1910.63(e) (2000) ("When unequal treatment in the assessment process is the basis of the appeal, the inequity of the assessments must be proved by clear and convincing evidence."). To satisfy its burden, the challenging party must submit documentation showing the assessments of the subject property for the year in question and (as the Board recommends) at least three comparable properties. 86 Ill. Adm. Code 1910.65(b) (1997). The documentation should also show "the similarity, proximity[,] and lack of distinguishing characteristics of the assessment comparables to the subject property." *Id.*

¶ 34    Central Nursing contends that the Board disregarded its equity argument, even though it complied with the Board's rules regarding documentary evidence by submitting several grids containing assessment information and relevant property details for the subject property and eight

allegedly comparable properties. But the Board's decision establishes that the Board considered and rejected—rather than ignored—Central Nursing's equity argument. The Board's decision expressly recognized Central Nursing's argument that the subject property was inequitably assessed in comparison to similar properties and discussed the evidence that Central Nursing submitted in support of that argument. The Board noted that Central Nursing's evidentiary submissions were "convoluted" and contained "numerous discrepancies," but it nevertheless attempted "to ascertain the correct information for each comparable [property] based on the data" that Central Nursing submitted. Finally, after determining the fair market value of the subject property and reducing its assessment accordingly, the Board concluded that the property had been "fairly and equitably assessed" and that "no [further] reduction [was] warranted based on [Central Nursing's] equity argument."

¶ 35    Central Nursing asserts that the Board did not consider the entirety of its evidence, but the only example it gives is the Board's failure to consider the reply that it submitted after the hearing addressing updated assessment information for several allegedly comparable properties. The reply, however, contained argument not evidence. There is no question that the Board considered the *evidence* of updated assessments that Central Nursing submitted. Indeed, the Board's decision noted that the ALJ granted Central Nursing's request to submit updated assessment information and discussed the substance of that updated evidence, including the revised range of improvement assessments for the comparable properties identified by the parties.[4] Moreover, because Central

---

[4]Central Nursing notes that the Board described the updated range of improvement assessments for its comparable properties as $4191 per bed to $7700 per bed, while its updated submission identified a property with an updated improvement assessment of $3795 per bed. But the Board earlier explained that Central Nursing had provided conflicting information regarding the number of beds at the property in question. It appears that the Board calculated the updated per-bed improvement assessment for that property based on the lower bed count identified in Central Nursing's conflicting submissions, which produced an

Nursing has not alleged, let alone shown, that it was prejudiced by the Board's failure to consider its reply, reversal of the Board's decision on that basis is unwarranted. See *McCleary v. Board of Fire & Police Commissioners of the City of Woodstock*, 251 Ill. App. 3d 988, 993 (1993) (an "appellate court may reverse an administrative ruling only if there is error which prejudiced a party in the proceeding"); 735 ILCS 5/3-111(b) (West 2018) ("Technical errors in the proceedings before the administrative agency or its failure to observe the technical rules of evidence shall not constitute grounds for the reversal of the administrative decision unless it appears to the court that such error or failure materially affected the rights of any party and resulted in substantial injustice to him or her.").

¶ 36    Central Nursing further notes that the Board did not state the standard of review under which it evaluated the equity argument, but it provides no authority for the proposition that the Board's failure to do so justifies reversal of its decision. Central Nursing likewise faults the Board for discussing the equity argument in the "Findings of Fact" section of its decision, rather than the decision's "Conclusions of Law" section. Again, Central Nursing cites no authority that would support reversal of the Board's decision on this basis. Although the Board discussed the evidence that Central Nursing submitted in support of the equity argument in the fact section of its decision, its determination that the evidence and argument were insufficient to warrant a reduction in the property's assessed value was included in the decision's conclusions of law section. Taken as a whole, the Board's decision identified Central Nursing's equity argument, discussed the evidence that Central Nursing submitted in support of the argument, and concluded that the evidence and argument were unavailing. We find no basis for concluding that the Board failed to consider

---

improvement assessment of $4575 per bed. Central Nursing has not attempted to reconcile the discrepancy in the bed count it provided for this property.

Central Nursing's equity argument or any of the evidence that Central Nursing submitted in support of it.

¶ 37    Central Nursing also appears to challenge the merits of the Board's determination that the subject property was not inequitably assessed in comparison to similar properties. As the party challenging the assessment "on lack of uniformity grounds," it was Central Nursing's burden to "prov[e] the disparity by clear and convincing evidence." *Walsh*, 181 Ill. 2d at 234. "The issue of whether comparable properties establish the uniform assessment and valuation of properties is a question of fact." *Board of Education of Ridgeland School District No. 122, Cook County v. Property Tax Appeal Board*, 2012 IL App (1st) 110461, ¶ 31; see also *Du Page County Board of Review v. Property Tax Appeal Board*, 284 Ill. App. 3d 649, 653-54 (1996) ("The question whether the four comparable sales did or did not establish that the subject property was not uniformly assessed was a factual issue for the [Board] to resolve."). We thus review the Board's conclusion that Central Nursing failed to demonstrate that the subject property was inequitably assessed under the manifest weight of the evidence standard and will reverse only if the incorrectness of the Board's decision is clearly evident from the record. *Cook County Board of Review*, 403 Ill. App. 3d at 143.

¶ 38    In its brief, Central Nursing identifies four of the allegedly comparable nursing home properties that it and the Board of Review submitted below. According to Central Nursing, those properties, like the subject property, are located in Cook County, were built in the mid-1970s, and have improvement assessments that range from $4191 per bed to $8887 per bed. By comparison, the subject property's improvement assessment (as reduced by the Board) is $7327 per bed, which according to Central Nursing is higher than all but one of the assessments given to the comparable

properties identified in its brief. Although Central Nursing states that the allegedly comparable properties have between 190 and 313 beds and range in size from 49,600 square feet to 72,432 square feet (compared to the subject property's 245 beds and 65,088 square feet), it does not provide bed-count, building area, or assessment information for any of the comparable properties on an individualized basis. Nor does it discuss any other details, including type and quality of construction, that would bear on the similarity or dissimilatory of the comparable properties in relation to the subject property. Central Nursing likewise makes no argument that the subject property is more similar to the three comparable properties that received per-bed assessments lower than its assessment than it is to the comparable property that received a higher per-bed assessment. Central Nursing has thus forfeited any such argument. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). For all these reasons, we cannot say that Central Nursing demonstrated by clear and convincing evidence that the subject property was inequitably assessed in comparison to similar properties, nor that the Board's finding to that effect was against the manifest weight of the evidence.

¶ 39    Central Nursing also raises two challenges to the Board's determination regarding the fair market value of the property. The Board's "finding regarding the property's fair market value will not be reversed unless it is against the manifest weight of the evidence, which occurs only where all reasonable and unbiased persons would agree that the decision is erroneous and that an opposite conclusion is clearly evident." (Internal quotation marks omitted.) *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 51.

¶ 40    First, Central Nursing contends that the Board's decision was against the manifest weight of the evidence because it gave no weight to the value attributed to the property on the real estate

transfer declaration form filed after Central Nursing purchased the going concern. As Central Nursing notes, when it purchased the going concern in 2009 for $25 million, it and the seller attested that approximately $7.5 million of the total purchase price was allocated to the value of the real property. But Central Nursing offered no evidence at the hearing to explain how the parties to the transaction arrived at that valuation. And Central Nursing's own expert, Korth, testified that he would not accord any weight to a valuation made by a person who was not a certified real estate appraiser. Accordingly, the Board's decision to accord no weight to the real estate transfer declaration form was not against the manifest of the evidence. See *Kankakee County Board of Review v. Property Tax Appeal Board*, 337 Ill. App. 3d 1070, 1074 (2003) ("An administrative decision is not against the manifest weight of the evidence where the record contains some competent evidence to support the agency's finding.").

¶ 41 Second, Central Nursing contends that the Board's decision was against the manifest weight of the evidence because it relied on parts of Dost's appraisal, despite rejecting other parts of it based on errors identified by Braemer. But the Board was not required to accept or reject Dost's opinion wholesale. When faced with competing expert opinions, "it [is] not inherently improper for the [Board] to credit some of the evidence that both parties presented." *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 47. The Board may "consider conflicting appraisals and conclude that the property is worth a different amount than what any of the experts testified to." *Id.* ¶ 48. Here, the Board considered Korth's and Dost's competing appraisals, as well as Braemer's review of Dost's appraisal, and accepted the parts of each expert's opinion that it found credible and rejected the parts that it did not. On administrative review, we may not "reweigh the evidence, reassess the credibility of the witnesses, substitute [our] judgment for [the Board's], or make an independent

determination of the facts." *Id.* ¶ 51. Nor will we "disturb the [Board's] findings where there exists simply a difference of opinion regarding the actual value of the property." *Id.* Central Nursing has not shown that "all reasonable and unbiased persons would agree" that the Board's decision to rely on parts of Dost's appraisal and its ultimate determination of the subject property's fair market value were "erroneous and that an opposite conclusion [was] clearly evident." (Internal quotation marks omitted.) *Id.* We thus cannot say that the Board's decision was against the manifest weight of the evidence.

¶ 42                                    III. CONCLUSION

¶ 43    For the foregoing reasons, we affirm the decision of the Illinois Property Tax Appeal Board.

¶ 44    Affirmed.

¶ 45    PRESIDING JUSTICE GORDON, specially concurring:

¶ 46    I agree with the ultimate conclusion of the majority, but I must respectfully write separately. The expert witnesses who testified in the case at bar did not agree to the facts of this case, and their ultimate opinions varied based on the facts that formed the basis of their opinions. As a result, I cannot say that an opposite conclusion is clearly evident from the record based on the board's factual findings and conclusions. I thus must also affirm.

---

**No. 1-18-0994**

---

| | |
|---|---|
| **Cite as:** | *Central Nursing Realty, LLC v. Illinois Property Tax Appeal Board*, 2020 IL App (1st) 180094 |

---

| | |
|---|---|
| **Decision Under Review:** | Petition for review of orders of Illinois Property Tax Appeal Board, Nos. 11-31329.001-C-3 through 11-31329.010-C-3. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | John B. Wolf, of Ashman & Stein, of Skokie, for petitioner. |

---

| | |
|---|---|
| **Attorneys for Appellees:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Valerie Quinn, Assistant Attorney General, of counsel), for appellee Illinois Property Tax Appeal Board. |
| | Kimberly M. Foxx, State's Attorney, of Chicago (Cathy McNeil Stein, John J. Carey, and Benjamin R. Bilton, Assistant State's Attorneys, of counsel), for appellee Cook County Board of Review. |
| | Ares G. Dalianis, of Franczek P.C., of Chicago, for other appellee. |

---