2023 IL App (1st) 210799-U

FIRST DISTRICT,
FIRST DIVISION
April 24, 2023

No. 1-21-0799

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| COOK COUNTY BOARD OF REVIEW, | ) | |
| | ) | Petition for Review of an |
| Petitioner, | ) | Order of the Illinois Property |
| v. | ) | Tax Appeal Board |
| | ) | |
| ILLINOIS PROPERTY TAX APPEAL BOARD and | ) | Nos. 11-24443.001-C-3 |
| 401 NORTH WABASH VENTURE, LLC, | ) | through 11-24443-340-C-3 |
| | ) | |
| Respondents. | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Decision of the Illinois Property Tax Appeal Board reducing property assessment was not against the manifest weight of the evidence.

¶ 2     This case involves the property tax assessment for a portion of the Trump International Hotel and Tower Chicago. For 2011, the Cook County Board of Review (BOR) assessed the subject property at $15,604,993. The building's developer, 401 North Wabash Venture, LLC (401 North), filed an appeal with the Illinois Property Tax Appeal Board (PTAB), which issued a

decision in 2021 reducing the assessment to $9,240,000. The Board filed the instant petition challenging the PTAB's decision. For the reasons that follow, we affirm.

¶ 3                                  BACKGROUND

¶ 4        The Trump International Hotel and Tower Chicago is a 92-story building located in downtown Chicago. The building is mixed use, containing residential condominiums as well as a luxury hotel with associated commercial facilities. The assessment in dispute concerns the commercial portion of the building (henceforth "the subject property" or "the Trump Hotel"), which comprises 836,662 square feet, or 32%, of the total building area. As Class 5 commercial property under the Cook County Real Property Assessment Classification Ordinance, it is assessed at 25% of its market value. Construction of the property was completed in 2010, and the property achieved full market occupancy that same year, meaning that all rooms were available to be let or purchased.

¶ 5        401 North challenged the Trump Hotel's 2011 tax assessment before the BOR. The BOR reduced the assessment from $19,825,033 to $15,604,993, reflecting 25% of a market value of $62,419,972. 401 North appealed to the PTAB, seeking a reduction in market value to $33,000,000.

¶ 6        In support, 401 North submitted an appraisal prepared by Arthur Murphy, president of Urban Real Estate Research, and his associate Robert Kownacki, estimating the property's market value at $33,000,000 as of January 1, 2010. According to the appraisal, the Trump Hotel contains two "profit centers." The hotel profit center consists of 339 hotel rooms, hotel amenities, a spa area, and public parking. The "proposed retail arcade mall profit center" consists of 98,521 square feet of vacant property located on four floors overlooking the river. Although the hotel developers intended to use the space as a retail mall, "the best retail brokers in

downtown Chicago *** could not identify even one tenant for the space" in approximately three years. The appraisal stated that many major hotels along the Magnificent Mile have successful retail mall sections, but the Trump Hotel "is located in an out of the way location" and "does not participate in the synergism of the magnificent mile." Additionally, there are no elevators or escalators servicing the vacant area, and the layout is "irregular" and "very poor," making it "difficult to put a corridor through the space." The appraisal concluded that "this vacant unused space, at this time, adds no value [to] the fee simple market value of the property for ad valorem purposes."

¶ 7        The appraisal discussed three approaches to estimating value: cost, income, and sales comparison. The cost approach, which measures the cost of building the structure, was "not employ[ed]" because the subject property is only a portion of the building and the developer "has less than a full interest in the underlying land."

¶ 8        For the income approach, which measures the income-producing potential of the property, the appraisal analyzed the Trump Hotel's revenue and expenses from 2008 to 2010 and compared the data to other high-end luxury hotels in downtown Chicago. The appraisal found the hotel to be "very competitive" in the downtown hotel market, with 8% higher revenue per room than comparable hotels. After calculating the hotel's net operating income, the appraisal divided it by a capitalization rate (CAP rate) of 10.5% to reach a valuation estimate of $32,250,000. In computing the appropriate CAP rate, adjustments were made for the fact that the Trump Hotel is a "newly constructed hotel" in a "weak" and oversaturated hotel market.

¶ 9        For the sales comparison approach, the appraisal examined sales of 26 hotels in the downtown Chicago area between 2001 and 2009 and ultimately limited its analysis to four hotels located along Michigan Avenue. It adjusted the raw sales values in accordance with the

"Rushmore Approach," a "rule of thumb" that attributes 60% of the value of a hotel's sale price to the value of the real estate. The appraisal explained that the value of non-realty components must be deducted "to arrive at a sale price which reflects real estate only," which is difficult for "complex properties" such as hotels which have many non-realty components (*e.g.*, franchise affiliation, business goodwill, visibility, location, and facilities such as restaurants and fitness centers). Because of the "many potential adjustments needed," the sales comparison approach "is seldom given substantial weight in a hotel appraisal *** [but] can assist in bracketing a value to check the value derived by the income capitalization approach."

¶ 10        The adjusted sale prices of the comparables ranged from $95,638 to 275,858 per room during "the peak of the market" (three in 2006, and the fourth in 2008). In mid- to late 2008, a severe recession caused a "downturn in the hotel market," and "[t]he market *** is not expected to recover for at least 2 to 4 years." Additionally, "Chicago has lost its firm grip on the convention market and hotels similar to the subject are starting to suffer." Taking these market factors into account, the appraisal valued the Trump Hotel at $100,000 per room, for a total valuation of $33,900,000. Because of the difficulty of assessing value via the sales comparison method, the appraisal gave it only "limited weight" in its final value assessment of $33,000,000.

¶ 11        On December 12, 2017, the PTAB conducted a hearing on the tax appeal. 401 North called Murphy, the president of Urban Real Estate Research, as an expert in appraisal. In his 30 years as a private appraiser, Murphy appraised around 25 hotels in the downtown Chicago area every three years. Prior to that, he worked "in the assessor's office" and "was responsible for all the downtown hotels." Murphy and his associate Kownacki visited the property to inspect it on multiple dates between April 2009 and March 2011. The appraisal, written by Kownacki and reviewed by Murphy, reflects Murphy's expertise and familiarity with hotels in the area.

¶ 12        Murphy testified that he did not utilize the cost approach in his appraisal because the subject property is a vertically subdivided portion of a larger building, making it "almost impossible to do a cost approach." Additionally, the cost approach is typically not recommended for hotels. On cross-examination, counsel for the BOR sought to impeach him with a 2008 appraisal he performed on the subject property in which he included a cost analysis. Murphy explained that "if you read the [2008] appraisal, we're saying we didn't do a cost approach" and the cost value in that document "is generated from the income and sales approaches."

¶ 13        Regarding the income approach, Murphy testified that in his stabilized income analysis, he used a revenue value that was higher than the property's actual 2010 revenue, and an expense value "slightly" lower than the actual 2010 expenses. For the subject time period, the Real Estate Investor Survey reported an overall luxury hotel CAP rate of 7 to 13%, and the Research Corporation Real Estate Report had a range of 7 to 12%; thus, Murphy's CAP rate of 10.5% was "within the range."

¶ 14        Regarding the sales comparison approach, Murphy explained that there are two nationally recognized methods of adjusting a hotel's selling price to remove non-realty factors. The Linhoff method attributes "a lot more value" to non-realty factors, while the Rushmore method, which Murphy used, is more "conservative" and results in a higher valuation for the property. Murphy testified that adjusting for non-realty factors is "subjective" and difficult, so "I go to my income approach and see if it makes sense." However, he denied that his sales analysis was dependent upon his income analysis. He explained that the sales comparison approach provides "a range of values" that can be cross-checked against the value produced by the income approach in reaching a final valuation, and the income approach is generally considered the most reliable.

¶ 15        On cross-examination, Murphy acknowledged that the vacant portion of the subject property was marketed for sale at $1200 per square foot, which is the price of "prime Michigan Avenue Magnificent Mile space," but the subject property is not on the Magnificent Mile. Murphy's report does not detail any efforts to sell the vacant space at any other price. He acknowledged that similar riverfront properties contain restaurants and offices but did not analyze the rent charged by those properties in an attempt to value the vacant space.

¶ 16        The BOR did not present testimony at the hearing, but presented its "Notes on Appeal" prepared by a staff member which assessed the property at $15,604,993, reflecting a market value of $62,419,972. The BOR's valuation was based on six comparable hotel sales occurring from November 2006 to December 2011 for raw prices ranging from $136,569 to $326,768 per room. The sale prices in the BOR's notes "have not been adjusted for market conditions, time, location, age, size, land-to-building ratio, parking, zoning and other related factors" and also "have not been adjusted for the non-realty component of the sale." An accompanying memorandum states that the notes are "not intended to be an appraisal or estimate of value and should not be construed as such."

¶ 17        The PTAB issued a unanimous final administrative decision in June 2021 in which it found that 401 North presented the best evidence of value on the record. Murphy's valuation of $32,250,000 under the income method was "credible," since his detailed analysis of the property's income and expenses was "well supported and credible," and his estimate of the CAP rate was "well reasoned and justified." Regarding the sales comparison approach, the PTAB stated: "Although there are some issues with respect to the methods employed by Murphy and his reasoning, he was the only witness *** to explain the methodology and reasoning behind his

analysis." The PTAB concluded that his sales comparison valuation of $33,900,000 was "reasonable."

¶ 18        However, the PTAB found that Murphy undervalued the subject property by failing to attribute any value to the vacant retail portion. Since the vacant portion comprised 12% of the building area appraised, the PTAB increased Murphy's estimated value by 12%, resulting in a valuation of $36,960,000 and a revised total assessment of $9,240,000.

¶ 19        The BOR petitioned for review in this court pursuant to section 16-195 of the Property Tax Code (35 ILCS 200/16-195 (West 2020) (final decisions of the PTAB are subject to direct review in the appellate court when a change in assessed value of $300,000 or more is sought)).

¶ 20                                ANALYSIS

¶ 21        Final administrative actions of the PTAB are subject to review under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)), under which the findings and conclusions of an administrative agency on questions of fact are considered *prima facie* true and correct (735 ILCS 5/3-110 (West 2020)). 35 ILCS 200/16-195 (West 2020). Thus, we will not reweigh the evidence or substitute our judgment for that of the PTAB. *Cook County Board of Review v. Property Tax Appeal Board*, 403 Ill. App. 3d 139, 143 (2010). We will reverse the PTAB's factual findings only if they are against the manifest weight of the evidence, *i.e.*, the "opposite conclusion is clearly evident from the record." *Central Nursing Realty, LLC v. Illinois Property Tax Appeal Board*, 2020 IL App (1st) 180994, ¶ 32.

¶ 22        All appeals to the PTAB are *de novo* (35 ILCS 200/16-180 (2020)), meaning that the PTAB accords no precedential weight to prior valuations by the BOR. The PTAB considers "only the evidence, exhibits and briefs submitted to it, and will not give any weight or consideration to any prior actions by a local board of review or to any submissions not timely

filed or not specifically made a part of the record." 86 Ill. Admin. Code § 1910.50(a). When market value is the basis of an appeal to the PTAB, the taxpayer must prove the value of the property by a preponderance of the evidence. *Nat'l City Bank of Michigan/Illinois v. Illinois Property Tax Appeal Board*, 331 Ill. App. 3d 1038, 1042 (2002).

¶ 23    Illinois law requires property to be valued at its fair cash value, which is synonymous with fair market value. *Cook County Board of Review (Omni) v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 480 (2008) (market values "are the standard to be used in valuing property for tax purposes" (internal quotation marks omitted)). Here, the BOR argues that the PTAB's valuation of the property is against the manifest weight of the evidence because (1) Murphy's sales comparison approach was not developed independently and "lacked any sound justification"; (2) his income approach "warranted no weight"; (3) he did not provide a "credible explanation" for not developing a cost approach; (4) he "lost credibility" by attributing no value to the vacant portion of the property and by making various typographical errors in his appraisal report; and (5) the BOR's evidence was more persuasive.

¶ 24                    Sales Comparison Approach

¶ 25    The BOR argues that Murphy's sales comparison approach is flawed because it was not developed independently but relied on his income approach, in contravention of proper appraisal practice, which "requires that each approach to value be independent of each other and then reconciled among the approaches to estimate a final conclusion of value for the property." (Internal quotation marks omitted.) *West Loop Associates, LLC v. Property Tax Appeal Board*, 2017 IL App (1st) 151998, ¶ 61; see also *Omni*, 384 Ill. App. 3d at 480 ("Professional appraisals generally employ more than one method to determine valuation; the use of more than one

method in a single appraisal serves as a check on the value reached by the other method or methods").

¶ 26     Although there is conflicting evidence as to whether, and to what extent, the two approaches were developed independently in Murphy's analysis, the PTAB's finding as to the sufficiency of his sales comparison approach was supported by the record. The appraisal accurately states that the income and sales comparison approaches "must be developed independently of each other," and both approaches are detailed in separate sections. The sales comparison analysis states that "it is important not to rely solely upon comparable sales" because sale prices often "reflect the buyer's opinion of the going concern as well as the real property" and that "[w]e will also give consideration to our value via the Income Approach in establishing a value." However, at trial, Murphy denied that his sales comparison approach was dependent on his income approach. He explained that the sales comparison approach provides "a range of value" that one can cross-check against income values "to see whether your income approach is making any sense."

¶ 27     Essentially, the BOR asks us to reweigh the evidence and second-guess the PTAB's credibility determination, which we will not do. *Board of Review*, 403 Ill. App. 3d at 143; *Kendall County Board of Review v. Property Tax Appeal Board*, 337 Ill. App. 3d 735, 737 (2003) ("weighing evidence and determining the credibility of witnesses are jobs of the PTAB and are uniquely in its province").

¶ 28     In *West Loop*, 2017 IL App (1st) 151998, ¶ 61, the PTAB found the appraisal of the taxpayer's expert (Murphy) to be "flawed" where he "readily admitted" to using his income approach to adjust both his sales comparison and cost approaches. The PTAB instead gave credence to the city's expert, who testified to values derived by performing each approach

independently and supported by credible market data, and the city's rebuttal expert, who "credibly testified as to the flaws within the [Murphy] appraisal." *Id.* ¶¶ 63-64. The BOR's reliance on *West Loop* is misplaced, since in the case at hand, Murphy testified that his approaches were independently developed and the BOR did not present any expert to rebut his testimony.

¶ 29    The BOR next argues that Murphy lacked sufficient justification for his valuation of the Trump Hotel at $100,000 per room. In evaluating the sales comparison approach, the PTAB considers the "similarities and dissimilarities of the [comparable] properties" in relation to the subject property, as well as the "circumstances surrounding the sales" of those properties. *Ellsworth Grain Co. v. Illinois Property Tax Appeal Board*, 172 Ill. App. 3d 552, 558 (1988). As noted, the sales comparables used by Murphy ranged from $95,638 to $275,858 per room. The BOR contends that the $95,638 sale (the Sofitel) deserves little, if any, weight because the seller retained a 25% interest in managing the property, rendering it not an arm's length transaction. The next lowest comparable sale was for $148,489 per room. Thus, the BOR argues that its per-room value of $184,129 "fares much better" than Murphy's $100,000 estimate.

¶ 30    However, the BOR did not adjust for the drop in real estate values due to the recession, nor did it adjust for the FF&E (furniture, fixtures, and equipment) and intangible business values of the properties, which Murphy analyzed in depth in his appraisal. Moreover, as the PTAB stated in its decision, the BOR "presented no witness to critique or rebut Murphy's methodology or estimated value using the sales comparison approach to value." Accordingly, we do not find the PTAB's finding that Murphy's sales comparison approach was "reasonable" to be against the manifest weight of the evidence.

¶ 31                                    Income Approach

¶ 32        The BOR argues that Murphy's income valuation of the property "warranted no weight" because he used a valuation date of January 1, 2010, whereas the appraisal at issue was for 2011. The record reflects that the Trump Hotel's revenue increased year-by-year between 2008 and 2010, the year in which the property was finished and reached full market occupancy. The PTAB could reasonably have concluded that, once fully occupied, the subject property would not continue to experience further dramatic leaps in income.

¶ 33        The BOR also argues that Murphy used an excessive CAP rate in computing the property's value. In computing value under the income approach, the property's net operating income is divided by the CAP rate; thus, a higher CAP rate results in a lower valuation estimate. The evidence at the hearing indicates that Murphy's rate of 10.5% was squarely within the range reported by the Real Estate Investor Survey (with an overall luxury hotel rate of 7 to 13%) and the Research Corporation Real Estate Report (with a range of 7 to 12%). Moreover, the PTAB explicitly found Murphy's CAP rate to be "well reasoned and justified." Under these facts, we decline to reweigh the evidence.

¶ 34                                     Cost Approach

¶ 35        The BOR argues that Murphy failed to provide a credible explanation for not developing the cost approach to valuation. We disagree. Murphy testified that the cost approach, which measures the cost of constructing the property, is not typically useful for income-producing properties such as hotels and is "almost impossible" for a vertically subdivided portion of a building. Regarding his 2008 appraisal of the property, he explained that it did not contain a true cost approach, but generated a value based on the income and sales approaches. The 2008 appraisal itself states that it relies "minimally" on the cost approach, and the cost analysis

"employed the sales comparison approach" in estimating the value of the underlying land. Moreover, as discussed, the BOR did not present any expert testimony to critique or rebut Murphy's decision not to develop a cost analysis in his 2010 appraisal. On these facts, the PTAB reasonably found his two approaches to valuation to be sufficient. See *Omni*, 384 Ill. App. 3d at 480 ("more than one" approach generally employed in determining valuation).

¶ 36                                    Other Credibility Issues

¶ 37        The BOR argues that "the appraisal lost credibility by attributing no value to 12% of the property," *i.e.*, the vacant space intended for use as a retail mall. In fact, the PTAB found that Murphy undervalued the property in this regard and raised the final valuation of the property by 12% from Murphy's estimate, a finding which is not against the manifest weight of the evidence. See *Central Nursing Realty*, 2020 IL App (1st) 180994, ¶ 32.

¶ 38        The BOR also argues that the credibility of Murphy's appraisal is reduced by various typographical errors. For instance, the properties listed as sales comparisons are inconsistently numbered, although the substantive sales data is correct. The appraisal references the "weak O'Hare market" (the subject hotel is not in the O'Hare area), states that the hotel's name "evokes memories of the riches of colonial Hong Kong," and further states that "[f]inding a comparable sale for the subject would be akin to finding a needle in a haystack. The value is in the Peninsula name, the Peninsula image, and the decor." The BOR could, and did, vigorously cross-examine Murphy regarding these apparent errors at the PTAB hearing. In its decision, the PTAB acknowledged "inconsistencies" in the written appraisal but nevertheless found Murphy's analysis to be substantively credible. We decline the BOR's invitation to second-guess the PTAB's credibility determination. See *Kendall*, 337 Ill. App. 3d at 737.

¶ 39                               The BOR's Evidence

¶ 40        Finally, the BOR argues that the PTAB's decision was against the manifest weight of the evidence because the BOR's evidence of value was "more persuasive" than 401 North's evidence. We "will not disturb the PTAB's findings where there exists simply a difference of opinion regarding the actual value of the property." *Kraft Foods v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 51. Particularly since the BOR presented no expert testimony in support of its estimation of value, which was premised on raw sales data and was "not intended to be an appraisal or estimate of value and should not be construed as such," the PTAB appropriately gave "little weight" to the BOR's submission.

¶ 41                                  CONCLUSION

¶ 42        For the foregoing reasons, we affirm the final administrative decision of the PTAB.

¶ 43        Affirmed.