2025 IL App (1st) 221698-U
No. 1-22-1698

FIRST DIVISION
June 23, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| BURTON YOUNG & WOODFIELD CORPORATE CENTER SPE, LLC, | ) ) ) | Petition for Review of Order of the Illinois Property Tax Appeal Board |
| Petitioner-Appellant, | ) ) | |
| v. | ) ) | |
| ILLINOIS PROPERTY TAX APPEAL BOARD; COOK COUNTY BOARD OF REVIEW; PALATINE TOWNSHIP HIGH SCHOOL DISTRICT #211; and SCHAUMBURG CONSOLIDATED SCHOOL DISTRICT #54, | ) ) ) ) ) ) | Property Tax Appeal Board Docket No. 16-40766.001-C-3 |
| Respondents-Appellees. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.


**ORDER**

*Held*:     The decision of the Illinois Property Tax Appeal Board is affirmed because its findings pertaining to the market value of the subject property were not against the manifest weight of the evidence.

¶ 1     Petitioner Burton Young & Woodfield Corporate Center SPE, LLC (petitioner), the owner

of certain commercial real estate (the subject property), appeals from a decision of the Illinois

Property Tax Appeal Board (PTAB) that found the fair market value of the subject property for the tax year 2016 was $37 million. In doing so, the PTAB credited the expert appraisal submitted by the two intervenors herein, Palatine Township High School District #211 and Schaumburg Consolidated School District #54. Petitioner argues that the fair market value of the subject property was lower, and that the PTAB's findings were contrary to the manifest weight of the evidence. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3        The subject property is located in Schaumburg and is commonly known as Woodfield Corporate Center. It includes two office buildings that are 13 and 14 stories tall, a four-story parking deck, and surface parking for 2,092 cars. It has a net rentable building area of 521,362 square feet and a gross building area of 547,137 square feet.

¶ 4        In 2016, the subject property was purchased by Woodfield Corporate Center SPE, LLC for $32 million. Under the Cook County Real Property Assessment Classification, the subject property is a class 5 property. Accordingly, it is assessed at 25% of the fair market value.

¶ 5               Initial Assessment by Cook County Board of Review

¶ 6        For the 2016 tax year, the County Assessor valued the subject property at $10,501,477, consisting of a $1,861,920 valuation for land and a $8,639,557 valuation for improvements. The Cook County Board of Review (Board of Review) reduced the assessment to $9,926,880. The Board of Review's assessment corresponds to a fair market value of $39,707,520.

¶ 7                      Petitioner's Appeal to the PTAB

¶ 8        Petitioner timely filed an appeal of the 2016 assessment with the PTAB. Petitioner requested a reduction of the total assessment to $6,500,000, corresponding to a fair market value of $26 million. In support, petitioner submitted an appraisal by Frank C. Urban & Co. (the "Urban

appraisal") that appraised the subject property as having a fee simple market value of $26 million as of January 1, 2016.

¶ 9    The Board of Review did not present any appraisals to PTAB, but it submitted its "Board of Review Notes on Appeal" as support for its assessment of fair market value of $39,707,520. The Board of Review relied on six comparable sales of office buildings, which ranged in size from 268,000 to 351,425 square feet. The sale price for those six properties ranged from $30,500,000 to $62,000,000 and from $103.72 to $218.10 per square foot.

¶ 10    In April 2019, Palatine Township High School District # 211 and Schaumburg Community Consolidated School District #54 (together, the intervenors) intervened in the petitioner's appeal to the PTAB. The intervenors, who were represented by the same counsel, submitted an appraisal by Eric Dost of the Dost Valuation Group (Dost appraisal) that concluded the market value of the subject property was $37,000,000 as of January 1, 2016.

¶ 11    In rebuttal, petitioner submitted an appraisal review by John VanStanten of Stout Risius Ross LLC (VanStanten report) that was highly critical of the Dost appraisal. According to VanStanten, there were "several critical errors committed" in the Dost report, which relied on "inappropriate market data and assumptions."

¶ 12                    August 2021 PTAB Hearing

¶ 13    Petitioner separately appealed the 2017 assessment for the subject property. At the parties' request, the PTAB consolidated petitioner's appeals for the 2016 and 2017 tax year assessments. The Administrative Law Judge agreed to hold a single hearing addressing the appeals for both tax years, although it would issue separate decisions for each year. As the instant appeal concerns only

the 2016 tax year assessment, this order refers only to the relevant hearing testimony for that year's assessment.[1]

¶ 14                                     Petitioner's Expert Frank Urban

¶ 15       Petitioner elicited testimony from Frank Urban as an expert in real estate evaluation for tax purposes. During his testimony, Urban referred to his appraisal that evaluated the property as having a $26 million fair market value as of January 1, 2016.

¶ 16       Urban testified that the purpose of his appraisal was to assess the market value of the fee simple interest for ad valorem assessment purposes. He noted that the subject property sold in August 2016 for $32 million. He said this was indicative "of the lease fee property rights that transferred in the transaction."

¶ 17       Urban testified to why he believed the property was worth less than the sale price. Based on his conversations with the owners, he believed were "three primary areas where the sale should [be] adjusted as an indicator of value." First, he suggested the sale price value was too high, citing concerns as to whether AC Nielsen, a tenant who occupied roughly 35 percent of the building, would be staying past its current lease. Urban testified there were reports that AC Nielsen planned to relocate, although there were "40 months remaining on their lease term" at the time of the sale. Urban testified that the buyers in 2016 "did not believe definitively that [AC] Nielsen was vacating" and hoped for a lease extension.

¶ 18       Urban testified that AC Nielsen was paying $20.50 per square foot in rent, whereas other tenants paid significantly less, about "9 ½ to $12 to $13 a square foot." Thus, the "buyers knew

---

[1] Petitioner has filed a separate appeal in this court (no. 1-22-1922) from the separate PTAB decision concerning the 2017 tax year assessment for the subject property.

they were going to be getting this above-market income stream" under the AC Nielsen lease for 40 months after the sale.

¶ 19    Urban also opined that the 2016 sale price was higher than its true market value because the buyer saved "roughly $4 million" in leasing commissions and tenant improvement allowances that were paid by the seller in 2015. Urban stated: "Those items do not contribute to the market value of the real estate in the fee simple title. On a leased fee basis they do but in fee simple title the leasing commissions are spent, they're gone." Similarly, he believed that tenant improvement costs "to build out a space to a particular tenant's needs does not end up creating more value to that particular space in the marketplace" since other tenants might not want the space built out the same way. For these reasons, he opined that a "significant downward adjustment from the [$32 million] sale price is appropriate" to determine the property's "market value under fee simple interest."

¶ 20    Urban testified that his appraisal used the "cost approach, the income capitalization approach, and the sales comparison approach" to estimate the fair market value of the property.

¶ 21    For his income capitalization approach, Urban reviewed information about the property's tenants and leases, including the length of the leases, how much was spent on tenant improvements, and how much "free rent" was given, *i.e.*, rent abatement. Urban testified that typically tenants receive a rent abatement of "one month of free rent for every 12 to 15 months or so." He opined that such rent abatement requires making downward adjustments in estimating the property's fair market rent. For example, he explained that one tenant at the property had an eight-year lease, but "eight months out of those eight years they pay zero rent." Thus, although that tenant's rent was identified as $11.25 per square foot, it needed to be adjusted downward by "8.3 percent, one month out of 12."

¶ 22          Urban analyzed the current leases at the property and "comparable properties" in the area to determine revenue generated by the property. Urban also considered the subject property's historical occupancy and "looked at other properties and publications to determine market vacancy," and used that vacancy data to assess the subject property's "effective gross income." Urban deducted certain expenses to calculate a "net operating income" which is "capitalized using a rate."

¶ 23          Urban determined that the rental value per square foot was $23. He testified that only 497,182 square feet of the subject property was rentable. The remainder of the property was used for amenities, storage and common areas.

¶ 24          In his income analysis, Urban applied an occupancy rate of 82 percent (*i.e.*, an 18 percent vacancy rate) after considering "historical levels for the northwest suburban market", the "quality of the subject buildings," and other factors. Using this vacancy level, Urban calculated that the subject property's effective gross income was $8,869,011.

¶ 25          From the effective gross income ($8,869,011), Urban deducted total operating expenses of $3,282,179. Urban additionally deducted a total of $1,642,291 from gross income for leasing commissions, tenant improvements, and "replacements reserve." He thus calculated a net operating income of $3,944,541.

¶ 26          Urban explained that net operating income is capitalized to estimate market value. Urban testified that he considered a number of factors to determine a capitalization rate. He determined a capitalization rate of "8.0 percent before the tax load." He calculated a tax load of 7.5%, so that the loaded capitalization rate was 15.5%. Dividing the net operating income by this loaded capitalization rate resulted in a fair market value of $25,450,000 under the income approach. He

opined that the income approach "merits the greatest weight in the analysis" of overall market value, since this was an "income property."

¶ 27        Separately from the income approach, Urban testified he did a sales comparison approach, by which he identified seven comparable sales in the northwest suburbs. Those properties ranged in size from 291,789 square feet to 820,346 square feet. He noted that certain information was not available about those sales, including information on the terms of tenants' leases in the other properties. Under the sales comparison approach, Urban determined the value of the subject property was $52 per square foot and that its fair market value was $26 million. Urban opined that the sales comparison approach was "secondary" to the income capitalization approach, due to the limited available information about other properties.

¶ 28        On cross-examination, Urban acknowledged that his written appraisal stated that: "in recent years there has been debate over deducting Tenant Improvements (as well as Leasing Commissions and Reserves for Replacement) from the income stream" as operating expenses, in the course of calculating income under the income approach. The Urban appraisal also acknowledged: "Some experts point out, correctly, that when most buyers analyze a property's income for a prospective purchase, they do not deduct these items." Urban acknowledged he made deductions of $1,511,950 for leasing commissions and tenant improvements, and that they decreased the value of the net operating income by $9,754,516. He agreed that some experts might take a different approach. Urban indicated that if he had not made those deductions, he might not have used the same capitalization rate.

¶ 29        Also on cross-examination, Urban acknowledged that of the eleven properties used as rental comparisons, five were not identified but were marked "confidential." Urban also agreed that of the seven properties he used for the sales comparison approach, several of them had lower

occupancy rates than the subject property, and three of them had gone into foreclosure. Urban acknowledged that he did not personally run the search for comparable sales, and he did not know what parameters were used in the search.

¶ 30    On redirect examination, Urban testified that if a tenant receives a below-market tenant improvement allowance, the tenant will generally receive a below-market rental rate, in terms of rent per square foot. Conversely, if a higher tenant allowance is paid, then a higher rent is charged. He agreed that in an income approach, tenant improvements have to be "deducted at a market level amortized over a typical lease term." This impacts the capitalization rate: deduction of leasing commissions and tenant improvement "from the income stream create[s] a more secure income stream for capitalizations. Without those deductions the cap rate would be higher." Thus, he testified that if he had not made such deductions in his income analysis, a "higher capitalization rate would be appropriate."

¶ 31                                Board of Review's Case

¶ 32    Following Urban's testimony, the Board of Review was given the opportunity to present evidence. The Board of Review elected to rest on the written evidence previously submitted. The Board of Review did not present any appraisal or witness testimony.

¶ 33                             Intervenors' Expert Eric Dost

¶ 34    The intervenors elicited testimony from Dost, who has been a commercial real estate appraiser for 35 years. Without objection, Dost was accepted as an expert in commercial office appraisals for *ad valorem* tax purposes.

¶ 35    Dost testified about his appraisal, which concluded the value of the fee simple interest of the property was $37 million as of January 1, 2016.

¶ 36 Dost acknowledged the property sold in August 2016 for $32 million. He testified it had been "marketed as a Class A value add opportunity due to its below market occupancy" level of 73 percent. In addition, he noted that "the property's largest tenant [AC Nielsen] had a relatively short remaining lease term."

¶ 37 Dost recognized his appraisal of the subject property's market value ($37 million) was above the 2016 sales price of $32 million. However, he considered it "reasonable" as it was based on "stabilized market occupancy rates as well as market rents and expenses and cap rates as of the date of value and it was prepared consistent with ad valorem tax appraisal methodology for fee simple appraisals."

¶ 38 Dost testified the subject property has a total of 521,362 square feet of net rentable area, a large parking garage, and "good amenities." He stated there were $4.9 million in renovations and capital improvements from 2013 to 2015.

¶ 39 Dost testified that he used a land value analysis, a sales comparison approach, and an income capitalization approach to appraise the property's value. For the land value analysis, he "searched the market for comparable land sales" of commercial office developments. He included five land sales, with unadjusted prices ranging from $7.68 to $17.50 per square foot, with an average of $13.95 per square foot. He concluded that the market value of the land at the subject property was $13.50 per square foot, or $7.4 million.

¶ 40 For the sale comparison approach, Dost searched for "commercial multi-tenant office building sales" with multiple buildings. He identified six comparable sales, one of which had also been included in Urban's appraisal. The unadjusted price per square foot for those sales ranged from $47.13 to $150.01.

¶ 41    Dost testified he made adjustments based on various factors, including the nature of the property rights sold, conditions of sale, market conditions, age and conditions of the buildings, location, "land-to-building ratio or parking, economic characteristics, [and] construction characteristics." He considered whether to make an adjustment based on the fact that the comparable sales were leased properties and thus conveyed only the leased fee interest. However, he testified that "based on my analysis of the sales and the data available, it was my opinion that there was not a significant difference between the fee simple and lease[d] fee property rights."

¶ 42    Under the sales comparison approach, Dost determined that the market value of the subject property was $36,500,000, or $70 per square foot.

¶ 43    Dost then discussed his analysis under income capitalization approach. He reviewed the income and expenses for the subject property, including the rent roll Urban relied on for his appraisal. Dost also did a "market rent comparable" analysis, selecting five "rent comparable" properties that were summarized in his appraisal. Each of the five comparable rentals was a multi-tenant office building located in either Schaumburg, Rolling Meadows, or Des Plaines. For each of those properties, he assessed the "effective rent," meaning the rent "after deductions for things like free rent concessions." Their effective rental rates ranged from $11.80 to $17.46 per square foot.

¶ 44    Based on the lease information for the subject property and the rent comparables, Dost concluded that the overall market rent for the property was $10.50 per square foot. Applying this rate to the subject property, he determined an effective gross income of $9,313,630.

¶ 45    In making the gross income calculation, Dost (unlike Urban) did *not* deduct leasing commissions or tenant improvements as expenses. He testified that this was consistent with the practices of other appraisers:

"Tenant improvements with leasing commissions are considered below the line expenses. It's defined in the Dictionary of Real Estate Appraisal, Fifth Edition, that's an expense *** below the line, the net operating income line and *** not considered part of the total operating expense for the property valuations. *** In addition, the PWC [Price Waterhouse Coopers] real estate investor survey for the first quarter of 2016, zero percent of investors in the Chicago office market deduct leasing commissions and tenant improvements."

¶ 46    Dost calculated that the net operating income for the subject property was $3,197,005, equivalent to $6.13 per square foot.

¶ 47    Dost selected an overall capitalization rate for the subject property by referring to comparable sales, referring to the PWC real estate investor survey, and applying the "band of investment technique." He determined an appropriate capitalization rate was 8.5%. Applying this rate, Dost concluded the market value of the property was $37,500,000 as of January 1, 2016.

¶ 48    Thus, Dost concluded that the land value was $7.4 million, the market value under the sales comparison approach was $36.5 million, and the market value under the income approach valuation was $37.5 million. In reconciling these approaches, Dost placed "significant emphasis" on both the sales comparison approach and the income approach. He concluded that the fair cash value of the property as of January 1, 2016 was $37 million—that is, between the $36.5 million and $37.5 million values under the sales comparison and income approach.

¶ 49    On cross-examination by petitioner, Dost acknowledged there were expenditures for leasing commissions and tenant improvements. However, he maintained that they should not "be used in the capitalization of the NOI [net operating income] for valuation purposes," and so he did

not include them. He stated that the PWC survey indicated "zero percent of Chicago office investors deduct leasing commissions and tenant improvements as an operating expense." Dost maintained that leasing commissions and tenant improvements are "considered below the line items and should not be deducted for valuation purposes."

¶ 50    Dost further testified that his "rent comparable data was based on effective rents," which already took into account deductions for free rent, tenant improvements, and leasing commissions. He noted that he applied a market rent for the subject property of $10.50, which was lower than the effective rents of the five comparable properties, which ranged from $11.80 to $17.46. He opined that the market rent value of $10.50 per square foot "adequately considered rent concessions."

¶ 51    Elsewhere on cross-examination, Dost was asked why he applied this rental rate to 521,362 square feet. Dost answered that the Urban appraisal indicated there were 521,362 square feet of rentable area. He was then asked: "Doesn't the Urban appraisal report a percentage of office space and then deduct the portion that was below grade in building amenities, lobby *** things that are not leasable?" In response, Dost indicated his belief that such areas were in fact leasable, but Urban "chose to omit them."

¶ 52                    Petitioner's Rebuttal Expert VanSanten

¶ 53    Petitioner elicited the expert testimony of John VanSanten, who had prepared a written review criticizing Dost's $37 million appraisal.

¶ 54    VanSanten testified about several shortcomings he identified in Dost's analysis. Regarding the sales comparison approach, he criticized aspects of each of the six sales comparisons selected by Dost. For each of the properties, VanSanten noted that Dost did not make any kind of "adjustment for property rights conveyed," meaning an adjustment to reflect that they were sales

of "leased fee" rights, instead of fee simple rights. According to VanSanten, this resulted in an "apples to oranges comparison because he's comparing the conveyance of two different types of property rights." VanSanten noted that the six properties had capitalization rates ranging from 6.8 percent to 9.0 percent. He stated it "defies credibility" that Dost found "no property rights adjustment needs to be applied." VanSanten contrasted Dost's failure to make adjustments for these sales with how Dost treated the $32 million sale of the subject property: "there he thinks an adjustment does apply and he's estimating a value that's higher than the actual sale price of the 32 million. So there's just a huge inconsistency there ***." VanSanten said his "biggest issue" with Dost was that he was "not consistent with the way he treats the [comparable] sales versus the sale of the subject property."

¶ 55    VanSanten also opined that Dost's income approach was flawed. He noted that four of the five rental comparables identified by Dost "commenced after the January 1, 2016 date of value." He believed this was inappropriate because such transactions would not have been knowable to a buyer as of January 1, 2016.

¶ 56    According to VanSanten, another "big issue" with Dost's income analysis was that he applied his estimated market rent to the entire square footage of the building, including areas such as the fitness center, conference rooms, and cafe. VanSanten stated this was inappropriate because rent should only be applied to "office rentable area." In this manner, he believed that Dost was "essentially double counting the income associated with those non-office spaces because there's already income associated with" those other spaces.

¶ 57    Van Santen also testified that Dost's income analysis was flawed with respect to property taxes. Because they were unknown, it was improper for Dost to "estimate and deduct a property tax expense"; the appropriate method was to "load the cap rate with the effective tax rate."

According to VanSanten, Dost was "deducting a property tax expense that he estimates based on his conclusion of value from the sales comparison approach." In this manner, he believed Dost made a "circular argument" that assumed that his "sales comparison approach is correct." As Dost's property tax estimate was "dependent upon his conclusion of value from the sales comparison approach, VanSanten opined it rendered Dost's "entire income approach unreliable and not credible."

¶ 58    VanSanten also noted that at the time of the 2016 sale, the AC Nielsen lease still had 40 months remaining. He claimed Dost misrepresented the rental rate for AC Nielsen by stating the gross rent was $20 per foot, when actually the net rent was $20 per foot.

¶ 59                    The PTAB Decision Credits Dost's Appraisal

¶ 60    In October 2022, the PTAB issued a written decision finding that some reduction from the Board of Review's assessment was warranted, although not as much as petitioner desired. In so doing, it credited Dost's appraisal of fair market value of $37 million.

¶ 61    The PTAB noted that it had reviewed the evidence submitted by the Board of Review, as well as the Urban and Dost appraisals, the VanSanten report, and the hearing testimony. The decision summarized the testimony of Urban, Dost, and VanSanten on direct and cross-examination.

¶ 62    The PTAB gave "little weight" to the County Board of Review's evidence, finding it "consisted of five unadjusted sale comparables of office buildings that are not located near" the subject property.

¶ 63    The PTAB also stated that it gave "less weight to the Urban appraisal and testimony." It was "not persuaded" by Urban's "deduction of $1,511,950 from the subject's income for leasing

commissions [and] tenant improvements." It also noted that "four of the eleven rental comparables in the Urban appraisal were marked 'Confidential' and were thus unverifiable."

¶ 64    The PTAB found the "best evidence of market value" was the Dost appraisal, which indicated the subject property's market value was $37 million. In doing so, the PTAB found "the comparable properties listed in the [Dost] appraisal are similar to the subject in building size, age, and land to building ratio." The PTAB "f[ound] credible Mr. Dost's analysis of the comparable sales, including his statement that he considered the property rights conveyed in the comparable sales and concluded they did not need to be adjusted since the value of a leased fee interest can be greater than or less than the leased fee interest depending on the relationship between the contract and market rent."

¶ 65    The PTAB also credited Dost's income analysis. In so doing, the PTAB specifically agreed with Dost "that leasing commissions [and] tenant improvements should not be included as operating expenses."

¶ 66    Accordingly, the PTAB found the subject property had a market value of $37 million as of the 2016 assessment date. The PTAB noted that the property was subject to assessment at 25% of market value under the Cook County Real Property Assessment Classification Ordinance. Thus, the PTAB determined that the correct assessed value was $9,250,000. Although this was a reduction from the Board of Review's assessment ($9,926,880), the PTAB's assessment was still far more than the figure sought by petitioner ($6,500,000).

¶ 67    Petitioner filed a direct appeal from the PTAB decision pursuant to Supreme Court Rule 335, which allows for "statutory direct review of orders of an administrative agency by the Appellate Court." (Ill. S. Ct. R. 335 (eff. July 1, 2017)), and section 16-195 of the Property Tax

Code, which permits direct review of PTAB decisions in cases "where a change in assessed valuation of $300,000 or more was sought." 35 ILCS 200/16-195 (West 2022).

¶ 68        The matter has been fully briefed, including separate appellee briefs from the PTAB and from the intervenors. The Board of Review did not file an appellee brief, but it has adopted the intervenors' brief.

¶ 69                                        ANALYSIS

¶ 70        On appeal, petitioner contends that the PTAB erred in relying on Dost's "misguided appraisal report and expert testimony" and thus insufficiently reduced the 2016 assessment of the subject property. As explained more fully below, it claims that the PTAB's determination that the property was worth $37 million was error in light of the $32 million sale price in 2016, and that the PTAB otherwise erred in relying on the Dost appraisal despite its "incorrect methodology." For the following reasons, we find these contentions are without merit under the applicable standard of review.

¶ 71                                   Standard of Review

¶ 72        Final decisions of the PTAB are subject to review under the Administrative Review Law, 735 ILCS 5/3-101 *et seq*. 35 ILCS 200/16-195 (West 2018). Review lies directly in this court where, as here, a change in assessed value of $300,000 or greater is sought. *Id*.

¶ 73        The scope of our review "extend[s] to all questions of law and fact." 735 ILCS 5/3-110 (West 2018)). We review the PTAB's conclusions of law *de novo* and its resolution of mixed questions of law and fact for clear error. *Central Nursing Realty, LLC v. Illinois Property Tax Appeal Board*, 2020 IL App (1st) 180994, ¶ 32. However, the PTAB's "findings and conclusions on questions of fact" "are deemed '*prima facie* true and correct' (735 ILCS 5/3-110 (West 2020) and will be reversed only if they are against the manifest weight of the evidence, meaning that an

opposite conclusion is clearly evident from the record." *Id*. (citing *Cook County Board of Review v. Property Tax Appeal Board*, 403 Ill. App. 3d 139, 143 (2010).

¶ 74    "[W]eighing evidence and determining the credibility of witnesses are jobs of the PTAB and are uniquely its province." *Kraft Foods, Inc. v. Illinois Property Tax Appeal Bd*., 2013 IL App (2d) 121031, ¶ 51. This court "does not reweigh the evidence, reassess the credibility of the witnesses, substitute its judgment for that of the PTAB, or make an independent determination of the facts." *Id*.

¶ 75    As the "findings of an administrative agency are *prima facie* correct," "the court should not intervene in a case where property has been assessed higher or lower than it should have been through a mere error of judgment by the administrative agency." *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 42. "However, where the court is faced with potential use of an improper method of valuation, rather than with a mere difference of opinion as to the market value of a particular parcel, courts have intervened." *Id*.

¶ 76    The PTAB's finding regarding the fair market value of a property "will not be reversed unless it is against the manifest weight of the evidence, which occurs only where all reasonable and unbiased persons would agree that the decision is erroneous and that an opposite conclusion is clearly evident." *Central Nursing Realty* , 2020 IL App (1st) 180994, ¶ 39 (quoting *Kraft Foods*., 2013 IL App (2d) 121031, ¶ 51). "This court will not disturb the PTAB's findings where there exists simply a difference of opinion regarding the actual value of the property. [Citation.]" *Kraft Foods, Inc.*, 2013 IL App (2d) 121031, ¶ 51.

¶ 77    With this deferential standard in mind, we turn to petitioner's contentions.

¶ 78        The 2016 Sale Price Did Not Set a Ceiling on the Assessment of Fair Market Value

¶ 79        The petitioner's primary contention is that we should find error because the PTAB assessed the fair market value of the property as $37 million, higher than the $32 million sale price. Petitioner asserts that the actual sales price is the best evidence of a property's fair market value in 2016. As the subject property was sold for $32 million in an arms-length transaction, petitioner contends that this figure "should have provided a ceiling as to the Subject Property's fair market value, the highest possible value the PTAB could have assessed."

¶ 80        After reviewing pertinent case law, we find no support for the suggestion that PTAB was precluded from assessing a market value higher than the 2016 sale price. Rather, PTAB credited Dost's appraisal and testimony, in which he (1) explained why he did not think the $32 million sale price reflected the full market value, and (2) determined the property had a higher value under a sales comparison approach and an income approach. The PTAB was permitted to credit that expert evidence.

¶ 81        "Illinois law requires that all real property be valued at its fair cash value, estimated at the price it would bring at a fair voluntary sale where the owner is ready, willing and able to sell but is not compelled to do so ***." *Kraft Foods, Inc.*, 2013 IL App (2d) 121031, ¶ 43. " 'Fair cash value' " is synonymous with fair market value, and an arm's-length sales transaction is the best evidence thereof. [Citation.]"

¶ 82        *Kraft Foods* further explained:

> "There are three basic methods of evaluating real property: (1) the sales comparison approach; (2) the income approach, and (3) the reproduction cost approach. [Citation.] In the absence of market value established by a contemporaneous arm's-length sale, the sales comparison approach is the preferred method and should be used

-18-

when market data are available. [Citation.] The sales comparison approach relies on sales of comparable properties in the open market to reach a determination of the subject property's fair cash value. [Citation.] The existence of market data to determine fair cash value is central to the sales comparison (also called market) approach. [Citation.] The income method is based on the property's income-producing potential and divides the property's net income by a capitalization rate, which is a return on and of capital, as determined by market data. [Citation.]" *Id.* ¶ 43.

¶ 83　　While we acknowledge the principle that an arm's-length sales transaction is the best evidence of fair market value, we find no support for petitioner's suggestion that the 2016 sale price necessarily set a "ceiling" that constrained the PTAB from assessing a higher value, regardless of any other evidence.

¶ 84　　In making this argument, petitioner ignores the evidence in Dost's appraisal and testimony explaining his view as to why the property was worth more than the $32 million sale price. As the intervenors' brief points out, Dost emphasized that the $32 million sale was for a leased fee interest, not a fee simple interest. He also explained that the property had been "marketed as a Class A value add opportunity due to its below market occupancy" of 73 percent. In his testimony, Dost acknowledged his opinion of market value was "above the recent price" but "considered it reasonable since it's based on stabilized market occupancy rate as well as market rents and expenses and cap rates as of the date of value." Dost then explained his analysis under the sales comparison approach (under which he found the value was $36.5 million) and the income approach, by which he found the value was $37.5 million.

¶ 85      Petitioner does not cite any case suggesting that the sale price sets a "ceiling" on the assessed value, regardless of other expert testimony explaining why a higher valuation may be appropriate. Here, the PTAB explicitly credited Dost's analysis and corresponding testimony, as it was entitled to do. Thus, we reject petitioner's threshold argument that a PTAB valuation above the $32 million sale was price was necessarily erroneous.

¶ 86             Petitioner's Remaining Critiques of Dost's Opinions Do Not Establish that the
                PTAB Decision Was Against the Manifest Weight of the Evidence

¶ 87      Petitioner's remaining contentions amount to claims that the PTAB erred in relying on Dost's appraisal while "failing to consider" the various criticisms of Dost's analysis that VanSanten identified in his report and testimony. Petitioner asserts that its expert, Urban, did not make the same errors, such that Urban's appraisal should have been given more weight.

¶ 88      At this point it is appropriate to reiterate the standard of review, insofar as petitioner urges that "[t]his is not a case  involving a simple disagreement of opinion between experts." In doing so, petitioner cites the principle that "[W]here the court is faced with potential use of an improper method of valuation, rather than with a mere difference of opinion as to the market value of a particular parcel, courts have intervened." *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 43. Petitioner appears to be suggesting that Dost's valuation was improper as a matter of law, which would implicate *de novo* review. Nonetheless, scrutiny of petitioner's contentions make clear that, at bottom, it simply challenges the weight the PTAB afforded the conflicting expert opinions.

¶ 89      In this regard, we note that petitioner does not suggest that it was wrong as a matter of law for Dost to use a sales comparison approach or an income capitalization approach; indeed, petitioner's expert, Urban, used the same general approaches. Either approach is plainly acceptable under Illinois law. *Gateway-Walden, LLC v. Pappas,* 2018 IL App (1st) 162717, ¶ 61 (Illinois law

"recognizes three methodologies for the valuation of real property—sales comparison, income capitalization, and reproduction cost"). Certainly, the experts strongly disagreed as to whether particular steps and calculations within these general approaches were appropriate. Nevertheless, our case law establishes that the assessment of such conflicting expert testimony is within the province of the PTAB to resolve, meaning that the manifest weight of the evidence standard still applies.

¶ 90   This court's decisions in *Kraft Foods*, 2013 IL App (2d) 121031 and *Gateway-Walden, LLC v. Pappas,* 2018 IL App (1st) 162714 make this clear. In *Kraft Foods*, the petitioner taxpayer [Kraft] appealed from a PTAB decision finding the subject property had a fair market value of $40 million. Similar to this case, the PTAB considered conflicting appraisals from Kraft and intervenors, as well as a rebuttal report criticizing the intervenors' appraisal.

¶ 91   Kraft's appraiser, McCormick, concluded the property's value was $30 million, after analyzing the property under the cost approach, the income approach, and the sales comparison approach. *Id*. ¶¶ 8-14. The intervenors elicited testimony from another appraiser, Gibbons, who used the same three approaches and found the subject property had a value of $43.3 million. *Id*. at ¶¶ 17-24. In rebuttal, Kraft presented testimony from Anthony Uzemack, who opined that Gibbons' sales comparison analysis was "weak" because, *inter alia*, certain of the six comparable sales were "leased-fee bulk-sale transactions." *Id*. ¶ 27. The PTAB concluded the subject property had a market value of $40 million. *Id*. ¶ 32.

¶ 92   On appeal, Kraft argued that the PTAB "erred as a matter of law in relying on leased-fee bulk-sale transactions, not listed on the open market, to find the market value for the subject property." *Id*. ¶ 44. Kraft argued for *de novo* review by "fram[ing] this issue as whether the PTAB considered appraisals that applied the proper methodology for the valuation of the subject

property." *Id*. In response, PTAB argued the issue was not really "whether the proper value method was employed," but that Kraft was actually arguing that PTAB "erred in placing greater weight on" Gibbons' testimony. *Id.*

¶ 93    Our court rejected Kraft's suggestion that its challenge implicated *de novo* review:

"[I]n arguing that the PTAB erred in relying on improper comparable-sale appraisals, Kraft's contention is premised on the notion that the PTAB should not have relied on five of Gibbons' comparable-sale appraisals, because Uzemack testified that those appraisals had not been done in a way to reflect actual market value. However, Gibbons specifically testified that his comparable-sale appraisals did reflect actual market value. Thus, as Kraft is essentially arguing that the PTAB should have placed greater weight on Uzemack's testimony than on Gibbons', we will not disturb the PTAB's decision unless it is against the manifest weight of the evidence. [Citation.]" *Id*. ¶ 46.

¶ 94    In 2018, this court further clarified that a party does not invoke *de novo* review merely by asserting attacks on an expert's "methodology." *Gateway-Walden, LLC v. Pappas,* 2018 IL App (1st) 162717 (rejecting as an "oversimplification" defendant's claim that all challenges to opposing expert's methodology should be reviewed *de novo*). This court explained that Illinois law and "generally favors the sales comparison approach" among the three methodologies for the valuation of real property—sales comparison, income capitalization, and reproduction cos. *Id*. ¶ 61. We recognized: "We have traditionally conducted *de novo* review on the question of whether an appraiser properly ignored the preferred methodology—the sales comparison methodology—in a

given case and we have rejected the refusal to use that methodology when market data was available to make sales comparisons. [Citations.]" *Id*. ¶ 62. We explained:

> "It makes sense to review that question *de novo*. Illinois law clearly favors the sales comparison approach; either that appraisal was used or it was not used; and if it was not, we need only review the record to determine whether there was evidence of reliable comparable sales. We are not required to delve into the minutiae of expert testimony or make credibility determinations appropriately left to the trier of fact." *Id*. ¶ 64.

¶ 95 Importantly, this court explained that *de novo* review does not extend to *all* steps of expert's analysis:

> "But we are unwilling to take *de novo* review any further than that, and defendant has cited no case law that would support our doing so. As one might expect in the appraisal of property, within each of those three valuation methodologies, there are various choices appraisers must make—which kinds of sales to compare, for example, or how to capitalize income—and we will not subject every choice an expert makes to *de novo* review, simply because defendant refers to each of those choice as 'methodology.'" *Id*. ¶ 65.

¶ 96 *Gateway-Walden* thus held that "a party's objection to the testimony of an opposing expert on the basis that the expert's testimony includes improper elements or adopts a different theory of valuation goes to the weight, rather than the admissibility, of that testimony. [Citation.]" *Id*. That is, challenges amounting to attacks on the weight that should have been given to expert testimony

are "properly reviewed under the manifest-weight standard." *Id*. ¶ 66 (citing *Kraft Foods,* 2013 IL App (2d) 121031; see also *Shawnee Community Unit School District No. 84 v. Illinois Property Tax Appeal Board*, 2022 IL App (5th) 190266, ¶ 95 (rejecting petitioner's attempt to "avoid the deferential manifest weight-of-the-evidence standard by arguing that the PTAB erred as a matter of law when it valued the subject property based on [prior property owner's] prior business decisions rather than the subject property's income-producing capabilities.").

¶ 97       Having clarified the proper standard of review, we assess the specific claims of error in how the PTAB assessed the expert testimony.

¶ 98       It Was Not Against the Manifest Weight of the Evidence for the PTAB to Credit Dost's

Income Analysis

¶ 99       Petitioner urges that PTAB should not have given any weight to Dost's income approach, because Dost "failed to include leasing commissions and tenant improvements as operating expenses."

¶ 100       Petitioner notes that on cross-examination, Dost agreed that tenant improvements and leasing commission must be "accounted for in an appraisal." Petitioner claims that Dost improperly omitted these items "because of his personal belief that they are not to be used in the capitalization of the net operating income for valuation purposes." Petitioner suggests that this "rendered Dost's appraisal unreliable such that the PTAB should not have given it any weight".

¶ 101       This contention is clearly flawed, insofar as it asks that we substitute our judgment for that of the PTAB on its choice to credit one expert over another on the proper calculation under the income approach. An objection to an opposing expert's testimony "on the basis that the expert's testimony includes improper elements or adopts a different theory of valuation goes to the weight" of that testimony. *Gateway-Walden*, 2018 IL App (1st) 162714, ¶ 65.

¶ 102    In their appraisals and testimony, petitioner and the intervenors' experts offered conflicting opinions as to whether, in the course of assessing value under the income approach, leasing commissions and tenant improvements should be deducted in calculating the subject property's net operating income. Urban, petitioner's expert, testified that it is necessary to deduct leasing commissions and tenant improvement. Significantly, on cross-examination, Urban acknowledged that this is an area on which experts disagree. Dost testified that he did *not* deduct leasing commissions or tenant improvements as expenses, as he believed this was consistent with practices of other appraisers in the Chicago area.

¶ 103    Simply put, there was a battle of the experts on this particular topic. It was the role of the PTAB to evaluate the evidence on this point. Notably, the PTAB decision explicitly noted the conflicting testimony on this aspect of the income approach calculation. This was one of several areas where the PTAB had to assess conflicting expert testimony in evaluating the Dost and Urban appraisals.

¶ 104    We reiterate that PTAB's conclusions on questions of fact are deemed *prima facie* correct. *Central Nursing Realty*, 2020 IL App (1st) 180994, ¶ 32. Petitioner does not demonstrate that PTAB's decision to credit Dost's approach with respect to the treatment of leasing commissions and tenant improvements within the income analysis was against the manifest weight of the evidence, *i.e*, it cannot show that the opposite conclusion was "clearly evident from the record." *Id*. This is especially the case where petitioner's own expert, Urban, acknowledged there is debate among experts on this particular point.

¶ 105    VanSanten's Critiques of Dost's Appraisal Do Not Render the PTAB's Decision Against the Manifest Weight of the Evidence

¶ 106    The same reasoning leads us to reject petitioner's alternative arguments that we should find the PTAB erred because it credited Dost without addressing the various "shortcomings" that VanSanten identified in his criticism of Dost's appraisal. Petitioner urges that the appraisal of its expert, Urban, "does not commit the same errors" as Dost. Petitioner essentially asks us to reweigh competing expert opinions.

¶ 107    Petitioner's brief summarizes VanSanten's criticisms and claims PTAB ignored them. With respect to the sales approach, it repeats VanSanten's criticism that Dost failed to make downward adjustments of the comparable sales to reflect that they were for "leased fee sales" instead of fee simple interest. Petitioner emphasizes VanSanten's opinion that it was inconsistent for Dost to conclude that the subject property warranted an upward adjustment in market valuation from the 2016 sale price of $32 million, yet Dost failed make downward property rights adjustments to the comparable properties. Petitioner thus asserts (without any supporting case law) that Dost's sales comparison analysis "should not have been relied upon" by the PTAB.

¶ 108    In similar fashion, petitioners urge that PTAB ignored the "series of flaws" that VanSanten identified in Dost's income approach. Petitioner repeats the criticisms that Dost did not properly account for leasing commissions and tenant improvement allowances. Petitioner also recites VanSanten's criticism that Dost erred by applying the same market rent per square foot to the entire square footage of the property, without differentiating between office space and amenities. Petitioner notes VanSanten's testimony that by doing so, Dost was "essentially "double counting' the income associated with those non-office spaces because there is already income associated with those" non-office areas.

¶ 109    Petitioner also highlights the criticisms in VanSanten's report that Dost's income analysis "inappropriately applies a partial Effective Tax Rate load to account for real estate taxes" and

amounts to "circular" analysis. Petitioner refers to VanSanten's criticism that Dost's income analysis was "circular" in that it "assume[d] the value conclusion from the Sales Comparison Approach is correct and estimates the real estate tax expense based on that value." According to VanSanten, this rendered Dost's income capitalization analysis "effectively a 'rubber stamp' on the Sales Comparison Approach." Petitioner cites VanSanten's testimony to urge that "because the Dost Appraisal's use of the sales comparison approach overvalued the Subject Property, the other calculations in the Dost Appraisal, which assume the correctness of Dost's sales comparison analysis, are inherently flawed and necessarily overvalue the Subject Property."

Notably, petitioner does not cite any case law indicating whether this court has found similar criticisms to be grounds for reversing a PTAB valuation. Instead, it simply urges that VanSanten's report "discredits the Dost Appraisal." Petitioner proceeds to argue that its expert, Urban, did "not commit the same errors" in the course of assessing the market value of the property as $26 million.

¶ 110    Petitioner thus urges that the PTAB "*failed to afford proper weight* to the Urban Appraisal and Urban's testimony as to the proper method and outcome for determining market value." (Emphasis added). In short, petitioner is arguing that the PTAB erred because it credited Dost's $37 million appraisal while failing to give adequate weight to VanSanten's criticisms of Dost's appraisal, or Urban's competing appraisal of $26 million.

¶ 111    Keeping in mind our role and the deferential standard of review, we find petitioner's arguments are without merit. That is, petitioner does not demonstrate that the PTAB's decision was against the manifest weight of the evidence.

¶ 112    We note that both petitioner's expert (Urban) and intervenors' expert (Dost) undertook a sales comparison analysis, as well as an income approach. Both approaches are valid under Illinois

law. See *Gateway-Walden*, 2018 IL App (1st) 162714, ¶ 61. Thus, petitioner cannot successfully dispute that Dost used a generally acceptable methodology.

¶ 113        Certainly, Urban and Dost disagreed about certain aspects of the data used and steps taken in the calculations under either method. And VanSanten criticized many aspects of Dost's valuation.  Yet, our court has made clear that such disagreements between experts are matters of credibility to be weighed under the manifest weight of the evidence standard. *Id.*  ¶ 65 (criticism of an opposing expert "on the basis that the expert's testimony includes improper elements or adopts a different theory of valuation goes to the weight, rather than the admissibility, of that testimony").

¶ 114         The record reflects that the PTAB assessed and considered the conflicting expert testimony before crediting Dost's appraisal and testimony. Contrary to petitioner's suggestion that the PTAB ignored the various criticisms of Dost's appraisal offered by VanSanten, the PTAB's decision specifically discussed VanSanten's testimony, in addition to summarizing the direct and cross-examination of Urban and Dost. The decision indicates that the PTAB considered the documentary evidence and testimony and determined that Dost's appraisal of $37 million and his supporting testimony was credible.  It was certainly within its province to do so.

¶ 115        While petitioner identifies  points on which its experts disagreed with Dost, "[t]his court will not disturb the PTAB's findings where there exists simply a difference of opinion regarding the actual value of the property." *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 51. We reiterate that the PTAB's finding of fair market value "will not be reversed unless it is against the manifest weight of the evidence, which occurs *only where all reasonable and unbiased persons would agree that the decision is erroneous and that an opposite conclusion is clearly evident*."  (Emphasis added.) *Central Nursing Realty*, 2020 IL App (1st) 180994, ¶ 39 (quoting *Kraft Foods*, 2013 IL

App (2d) 121031, ¶ 51). After considering petitioner's various criticisms of the PTAB's decision, we find petitioner has not overcome this highly deferential standard.

¶ 116                                    CONCLUSION

¶ 117          For the foregoing reasons, we affirm the decision of the PTAB.

¶ 118          Affirmed.